Thank you. Ms. Wagner, your honors, may it please the court. Jason Kokinda is the appellant defendant here who was found guilty after a jury trial of failure to register as a sex offender. The defendant's complaint is that there was no activity, no evidence presented of any activity that should trigger the court instructed the jury rather than sticking to the plain ordinary English usage of the word change of residence, which was the crucial element in this case. The jury was instructed that they could find that he resided where he chose to station himself during the day. It's an interesting set of facts. The client lived in campgrounds in four separate counties in three different states during the 36 day period of time designated in the indictment and obviously carefully selected by the U.S. Attorney's Office for that purpose. He lived, you know, in those separate campgrounds in three different states. He did not live in Elkins, West Virginia, which they identified as the place which they believed he resided. But what he did do was commute to Elkins during the day to do routine things like grocery shopping. He went to the YMCA for exercise and may have taken a shower there occasionally, took advantage of free Wi-Fi in a public park. The kind of the piece to resist resistance of the government's case was a list of credit card transactions where he shopped at Kroger, Walmart, got car repairs, bought a day pass at the YMCA and under the regulations here. Why isn't that sufficient to indicate that there's an obligation to register? Because this is obviously where he goes every day. Judge, again, you know, we follow Justice Alito's guidance in Nichols, which I think is the landmark case. And again, we have a strong disagreement between myself and the government about the importance of that Nichols case. But he did not reside. You don't reside someplace where you go, even if you go every day, although he didn't go every day. And I'm sorry, you your client proposed a jury instruction that says resides means where someone habitually lives and habitually lives means where they live with some regularity. They live in the relevant sense where they live for at least 30 days. And your client proposed a jury instruction that quoted from these SMART guidelines, these regulations promulgated by the attorney general. So some of this, I think, has been given up, hasn't it? And you can challenge the instruction that was actually given, but not the idea that these regulations are relevant or that someone can be said to live somewhere just because they are there for about 30 days. Judge, respond to that. My defense counsel at that stage, which which was the public defender's office, did object to the use of the so-called SMART guidelines in crafting these jury instructions as the discussions went on in. They objected to certain parts of it. They proposed a jury instruction at Supplemental Appendix page five that quotes that uses those SMART guidelines. So, you know, the threshold question of can we can the court use those SMART guidelines is off the table. Now, how much the court used and what parts it used is up for debate, whether that was appropriate. Judge, first, I would say I don't believe they did anything to kind of waive that argument. I think as the charge conferences went on and there were several of them as the trial was wrapping up in which it became clear that the judge had been convinced the government's version was these SMART guidelines have the force and effect of law. Therefore, I'm going to use them. And I think they conceded if we're going to use them, here's a part that would make sense to actually aid. But then what the court did. Clarify for me. I'm sorry, Judge. It's part of your argument that using the guidelines is not permissible. That's part of it. And of course, we have precedent that says they are maybe wrong. Our precedent says that they are and that we're to use them. And judging that obviously gets into the Chevron deference question, which obviously this court may want to kick the can down the road a little bit till the Loper Bright opinion comes back and see if there's any guidance there. We do take the position officially that that Chevron deference doesn't apply in cases which have direct criminal consequences, as in this case, and therefore they shouldn't apply. But even if the court is willing to go there, secondarily, a court may agree with you eventually. It looks like they're headed. I don't want to jinx myself. Yeah. But secondarily, if they did, it is very clear, although you have to read them over and over as Judge Cleese did and I'm sure Ms. Wagner has. If you read those guidelines carefully, it's very clear that part of the guidelines talks about the obligations that an offender has. But large swaths of those guidelines apply only to the jurisdictions in the information they must obtain if and when someone is required to register and they're only required to register if there's a change of residence. And when you're camping in different campgrounds, that's something much more akin to residing than shopping somewhere. And he clearly was in three different states during this 36 period of time, never in any of them for the 15 days it would take to trigger registration requirements under West Virginia law, raising another another issue. But that is what happened. Figuring out a way to avoid the requirements of SORNA. Is that what he's doing? Judge, we have conceded because he testified openly in the court that he had studied the law of each state. He knew the law of these states. He knew what would trigger the guidelines. And it was his intention to remain in transit, not to reside anywhere. And he knocked himself out, frankly, to make sure people understood. I don't live here. I make sure people understood he was obstructing justice. I'm sorry to make sure people understood he was attempting to obstruct justice. But you don't have to answer that or respond to that. Maybe that's a polemical kind of approach to things, but he didn't think he was obstructing justice or violating the law. He thought, you know, I won't go too far into the weeds on this, but living the life of a sex offender is. Yeah, probably you shouldn't. I'm sorry. You probably shouldn't go too far into the weeds of what I just said. But you go ahead. Well, I'm just saying that he was very intentional about it and he conceded that much at the trial. He did not feel this was a decision. Understand this correctly was essentially I'm not a resident of any place. Exactly. Exactly. And Justice Alito addresses that possibility in Nichols. He talks about what if someone left Kansas on his way moving to California, stays in hotel for a period of time and he doesn't specify the period of time. But clearly that temporary housing is excluded from one residence. To another residence, that is the just that I will concede is the distinction in my case, my client and frankly, Ms. Wagner, people address this better than I not clear where that came out. He and his mother were attempting to arrange for a trailer. He was going to live in somewhere back in Connecticut or New Jersey or something like that. So he did sort of have an ultimate destination, but it's not clear he was in transit for an indefinite period of time. That is clear. But I think that's covered clearly by Justice Alito's hypothetical in his case. And he doesn't put any time limit on that. He just says these are clearly if you use change of residence in the ordinary English usage, it does not include temporary lodging such as hotels. Alito's example under the regulations, if he happened to park somewhere for 30 days, he had to register. Right. Yeah, and I would say if if the court were to determine that the guidelines were applicable, if you go all the way back in this circuit to the Bruffy case, Judge Gregory suggested if we're going to give some use that to flesh out any gap, then certainly the 30 days threshold, which is stated in the guidelines, might be applicable. But one point I'm not sure I ever made it to in the guidelines, Section six, part six of the guideline is the part that is clearly directed to the jurisdictions. Here is information you should get if and when a person is required to register. But the judge adopted selectively passages from that, which frankly just became confusing and allowed a jury to find if if he's seen sitting in a park at the picnic table in a park for several days over a period of a month, well, we can say that's where he reside. And that clearly enlarged, greatly enlarged, frankly, that crucial element of residence or change of residence. I might address another issue, and that is there is a Tenth Amendment claim raised here, and I raise it to point out that the difference between this and the Kennedy versus O'Leary case in our circuit is that in that case, it was clear that whether a person, well, the presumption was that in some jurisdictions you can register even if you're not required to register. And the defendant in that case was refused registration initially, but later he was allowed to register. In our jurisdiction, the distinction is our Supreme Court has said we will not contort the requirements of our registry law to satisfy SORNA. We won't do that. And therefore, we believe that because it was he was incapable of registering here, he didn't have to go try and raise it as an affirming defense. That's more or less a fig leaf. You know, he couldn't be registered here unless he found some rogue state police officer who just said, oh, what the heck? I'm going to register you. And therefore, because of that conflict, the only way SORNA can be implemented here is by essentially commandeering the West Virginia State Police and saying you must register, even though your state law says they're not eligible to be registered. And we believe that's a valid Tenth Amendment question that should be raised. The government cites in their brief, I don't know how to pronounce it, Guidis case, I think maybe. But there are many cases on the other side. Most recently, I want to say it's a Sixth Circuit Harden case, again, on that Tenth Amendment issue. With that, I'll yield my time unless there are other questions. Anything else, Judge Thacker? No, thanks. All right, Ms. Wagner. Good morning, may it please the court. I would like to focus on whether the jury instruction in this case on what it means for a transient sex offender to habitually live in a location was an accurate statement of the law. And our position is that it was an accurate statement, whether this court simply looks to the SMART guidelines for whatever persuasive value it might have in interpreting SORNA or whether the court wants to afford Chevron deference to the SMART guidelines. And different panels of this court have approached the issue in different ways. In United States v. Bruffy, the court was looking at the very term at issue in this case, in this very context, a transient sex offender. And it was addressing not a jury instruction, but a vagueness challenge and a sufficiency of the evidence challenge. And without citing or referencing Chevron, the court looked to the SMART guidelines, largely including from the Eighth Circuit's case in United States v. Boyce, to understand what that phrase meant. And all three judges on the panel agreed that the phrase habitually lives was not unconstitutionally vague. And although the panel was divided on whether the government had presented sufficient evidence on whether that defendant was habitually living somewhere, there was no disagreement about looking to the SMART guidelines to inform the meaning of that context. And in his dissent, Judge Gregory found that although the guidelines were not binding on the court, they were persuasive. In United States v. Bridges, the court was asked to assess the term conviction, which was not defined by the statute. And again, turning to the SMART guidelines, the court recognized that it can and do have the force and effect of law. And although the court did not go through step by step the Chevron analysis, Judge Thacker wrote that it explicitly referenced and relied on Chevron in according to the guidelines deference in that case. The following year in United States v. Price, the court declined to afford Chevron deference to a different provision of the SMART guidelines for two reasons. One, there was no ambiguity in the statute. The court was assessing what courts are supposed to do when they're determining whether an offense is a sex offense, use the categorical approach or the circumstance specific approach. So there was no gap to fill because the statute answered the question. But the court was also unprepared to accept that the SMART guidelines offered a clear answer or the one that the answer that was proposed by the defendant. They didn't agree that it was a reasonable interpretation in light of the statutory purposes. And then most recently in United States v. Helton, the court again looked to the SMART guidelines, recognized that they had the force and effect of law, didn't apply or even reference Chevron, but looked to those SMART guidelines. And because the statute was silent on the question there and the guidelines were silent on the question there, they just turned to the ordinary meaning of the words. And so there was a disagreement among the panel on what the ordinary meaning of the words in that context were. It was the phrase sexual act. There was no disagreement about the approach. And so all of these cases are uniform on this point. When there's a gap in the statute, courts can look to the SMART guidelines to fill it. And in this scenario, there is a gap in the term and in the meaning of habitually lives. We think that that question has been answered in Broughy, although it's an unpublished opinion. The majority implicitly looks at the SMART guidelines in the context of what it means for habitually for a sex offender who's transient to habitually live somewhere. But explicitly in Judge Gregory's dissent, he says this term is not pellucid, it's not clear, it's not easily understood, and it's ambiguous and subject to interpretation. And so that's consistent with what this court has previously found to be a gap or an ambiguity in a statute. In National Electric, the court was applying the Chevron framework to a Department of Energy rule. And in answering the specific question, what constitutes an ambiguity or what constitutes a gap, Judge King wrote that if the statutory language doesn't plainly compel or clearly preclude a particular interpretation because in a certain set of circumstances, the precise import of the language is ambiguous, or if the statutory language is susceptible to a more precise definition, then courts can look to the agency interpretation. And that's exactly what we have here. The term habitually lives in the context of someone with a fixed abode. There's no need to really think about it that hard. It's where you live. It's where you spend your time when you're not working or going to school or running your kids to baseball practice. It's where you keep your belongings. But when you take the certain circumstances of a transient offender, the particular import of the words habitually lives is not it's ambiguous. And so the court and it's susceptible to a more precise definition. And so consulting the SMART guidelines is appropriate. When you turn to the SMART guidelines to see either do they have persuasive value or are they accorded Chevron deference, you see that which would mean precisely is it reasonable in light of the purposes of SORNA? The answer is yes. In the Bridges case, again, Judge Thacker articulated that the purposes of SORNA are to protect the public from sex offenders by requiring them to provide information to local authorities and then for the local authorities to make that information available to the public. And in Carr versus United States, the Supreme Court spoke directly to the purpose of 2250, the statute that we're here on, which is to punish people who try to elude the purposes of SORNA by traveling in interstate commerce. So the guidelines explanation of habitually lives in that context is consistent with that purpose. If someone is in a community and their presence in the community rises to a certain level, notwithstanding that they don't have a fixed abode, then it's reasonable and consistent with the purposes of SORNA to require them to let the authorities know that they are there. And in Mr. Kokinda's case, I do want to address something that my colleague said. There was nothing in West Virginia state law that precluded Mr. Kokinda from registering. The statute that is at issue is West Virginia Code Section 15-12-9, and it's got multiple subparts. One subpart is this one that would cover visitors, and it says for any person who resides in another state, which was not Mr. Kokinda, he did not reside in another state, and who is employed, carries on a vocation, or is a student in this state, or is a visitor to this state for more than 15 days, and who has to register in another state, has to register in West Virginia. That's subsection B. Subsection C says any person changing residence to this state shall register. And so this notion… What if he were able to prove that every night he stayed either at a campground in Virginia, Maryland, or Pennsylvania, never spent the night in West Virginia, but came there every day? Is that sufficient? I think it would be sufficient if you consider it in the light… Under the circumstances in Broughy, where you had an individual who was, you know, in a particular area, it could be sufficient. If Mr. Kokinda, you know, didn't have… What we had here was Mr. Kokinda to the exclusion of most other states present in West Virginia for a period of 37 days. So I think that it could be… What was the evidence that he was present, other than he just showed up every day and went to the Y or whatever he did? Well, we had eyewitness testimony from people in the community who saw him. That included her child was getting ready to go to school. The weather was going to turn bad. I don't think he confessed that he was showing up at daytime. What about at night? At night, the evidence that we had was that he had reserved a campground for a period of a week in one adjoining county within the state of West Virginia, and that he had reserved another campground in another adjoining county for a period of two weeks. And we also had a dearth of evidence that he was spending money in other places or that he had receipts. We knew about the two campgrounds. I think we had receipts from both of them. There were two search warrants that were obtained for Mr. Tokenda's vehicle. In that vehicle, they found receipts from lots of places in West Virginia, these campgrounds, and they didn't find evidence that he was staying elsewhere. So the only evidence that he stayed elsewhere was four transactions during that whole 37-period month where he spent money outside of West Virginia, outside of the state at all. No evidence that he spent the night somewhere else. Well, those four transactions reflected that he likely stayed the night in one night in Erie, one or two nights in Erie, Pennsylvania, and one or two nights in Winchester, Virginia, Front Royal, that area. Other than that, that was the only evidence, aside from his testimony, that he was going to all of these other campgrounds. But during that time, even when he says he's staying at all of these other campgrounds, he's in Elkins. Elkins is his home base. He's leaving for these day trips to other states from Elkins and he's returning. And so we think that's an indicia of living there, in addition to partaking in the community, partaking in the community's resources, shopping there. And not just, I mean, Mr. Kokenda was not charged for shopping in Elkins. He was in Elkins to the exclusion of most other places on a day-to-day basis. So is there, on this particular issue, is there anything else you want to tell us? And do you want to say anything about the issues that Mr. Frame has rested on, his brief on? Just with respect to the Tenth Amendment argument, I would just point out that we believe that the issue is squarely foreclosed by this court's precedent. And we're also here on plain error review. So we don't think that Mr. Kokenda could meet his burden on that issue. And unless the court has any issues on the sentencing... All right. Judge Thacker, you got anything else? I do not. Thanks. Thank you. And thank you very much, Ms. Wagner. Mr. Frame, you've got some rebuttal time. Thank you, Judge. The first thing I would say is don't lose sight of the big picture here. The big picture is the statute says you have to register if you change residence. The interpretation that was given to this and the jury instruction that was crafted clearly enlarges that. The idea of where you reside, even if you add into the definition of habitually reside... Habitual is a simple word that has a dictionary definition. It's based on the root of a habit, something that's fairly constant or something you do repeatedly. It's not complicated. It's plain English. So that's the big picture. I was going to Elkins every day. Isn't that a habit? OK, that's a habit, but it's not where it's not habitually reside. The word that that adjective is refining is reside. And nobody, only in a strained, hyper-technical legal fiction, does anybody say you reside where you do your grocery shopping and where you go to the gym. I would go back to, and Ms. Wagner has raised the Broughy opinion, and once again, this is pre-Nichols. This is pre-Nichols in which in Broughy is a case which, frankly, I kind of have problems with the holding in that. But nevertheless, pre-Nichols, I can understand thinking because it was still that pre-Nichols updating. You have to be registered somewhere kind of paradigm that they were thinking in. But even in Broughy, it made it clear that the defendant was in a defined jurisdiction. He was, I think it's Belhaven, Maryland or something like that. He may have stayed overnight with a friend or he may have stayed at a nearby place, but it was all in a very defined jurisdiction. And yes, Broughy did rely on the voice opinion because the savvy sex offender can't defeat the law by moving from one city to the other. But even in that same circuit, in the Lunsford opinion, they pointed out that although what was said in voice was aspirational, we don't want savvy sex offenders to be able to defeat. But in fact, they can because there's a hole in SORNA and there still is a hole in SORNA. And Justice Alito makes it perfectly clear what that hole is. And the only way to repair that is not a judicial remedy. It's a legislative remedy and it hasn't been done. So you have an offender like my client traveling around thinking he's perfectly within the bounds of the law and creative prosecution as in this case. And he becomes a convicted. But once again, going back to the habitually lives. And again, I like Justice Alito, he teaches some new vocabulary. It's not pellucid, but it's not ambiguous in the sense in which it requires, you know, Chevron deference to take, you know, precedence over the rule of lenity that would normally apply to interpreting criminal statutes. You use the ordinary tools of statutory construction to do that. It's a simple word. It has a Thank you very much. We appreciate the council's argument. Mr. Frame, I wanted to express to you on behalf of the court, our appreciation for your acting as court appointed counsel. I know that's not as lucrative as some other things. And you have a client here who may not be quite as amenable as some other clients, but we could perform our functions unless there were folks like you who would agree to serve in this capacity and we appreciate it. So we'll now come down on the Greek council and I'll ask the clerk to adjourn court signing down.
judges: G. Steven Agee, Stephanie D. Thacker, Allison J. Rushing